IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 1, 2018

**IN RE KARISAH N. ET AL.**

**Appeal from the Juvenile Court for Warren County**
**No. JV1054     William M. Locke, Judge**

_____

**No. M2018-00555-COA-R3-PT**

_____

Mother appeals the termination of her parental rights, arguing that termination was not in the children's best interest. We conclude that clear and convincing evidence supports both the grounds for termination found by the trial court and the trial court's best interest determination. Affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Tammy H. Womack, McMinnville, Tennessee, for the appellant, Amanda D.N.S.

Herbert H. Slatery, III, Attorney General and Reporter; Brian A. Pierce, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**Background**

On August 15, 2017, Petitioner/Appellant Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of Respondent/Appellee Amanda D.N.S.[1] ("Mother") and Respondent Eric B. ("Father") to their three daughters: Karisah A.L.N., born in March 2012; and twins Abigail L.S. and Alyssabeth E.S., born in June 2014.[2] The petition alleged that the Mother and the children had been involved in

---

[1] We refer to the parties by their first names and initials in termination cases to protect the identities of the children involved.

[2] The trial court terminated Father's parental rights, but he did not appeal. As such, we refer to Father only as necessary to adjudicate this appeal.

DCS services on several occasions, including one in which Karisah was removed from Mother's custody for a time. Eventually, on June 8, 2016, DCS removed all of the children from Mother's custody due to allegations of drug use. In the juvenile court's later order adjudicating the children dependent and neglected, the juvenile court found that the Mother had tested positive for illegal drugs in drug tests administered by DCS on April 28, 2016, and May 19, 2016, Mother was arrested for domestic violence on May 4, 2016, and on June 2, 2016, the children were found to be suffering from environmental concerns and exposure to drug use. The petition alleged as grounds against Mother abandonment by willful failure to support, abandonment by failure to establish a suitable home, substantial noncompliance with a permanency plan, persistence of conditions, failure to manifest a willingness and ability to assume custody, and severe child abuse. In support of the ground of severe abuse, the petition alleged that DCS performed hair follicle drug screens on the children, two of which tested positive for methamphetamine.

A trial on the termination petition was held on January 31, 2018. Michelle Cano, a DCS family services worker assigned to Mother's case, detailed DCS's involvement with the family. First, Karisah was placed in DCS custody in May 2014 and later adjudicated dependent and neglected. DCS later allowed a 90-day trial home visit and the case was closed. The two younger children were also the subject of a dependency and neglect action following their birth in 2014, but were not removed from the home at that time. In June 2016, following additional involvement between Mother and DCS, DCS removed all of the children. Eventually on August 16, 2016, the children were placed with their current foster family, where they have remained continuously since that time.

DCS created three permanency plans for Mother and the children while the children were in foster care. The first plan was created on June 22, 2016 and ratified on September 12, 2016. Mother's action steps under the plan included: (1) participate in a mental health assessment, including requiring Mother to apply for TennCare insurance if needed, follow all recommendations of the assessment, and sign all necessary releases so that DCS can obtain records; (2) allow DCS to conduct random pill counts if any medications are prescribed to her and take all medications as prescribed; (3) complete parenting class, provide proof of completion to DCS, and demonstrate effective parenting skills with the children; (4) complete an alcohol and drug assessment, actively participate in any recommended treatment, complete all recommended aftercare including alcoholic anonymous or narcotics anonymous classes; (5) refrain from associating with known drug users; (6) secure a legal means of income; (7) secure safe and stable housing with working utilities and a supply of food; and (8) resolve all legal issues and follow any and all rules of her probation. Mother participated in the development of the plan and agreed with the plan. A second plan was created on September 13, 2016, and ratified on March 27, 2017, with the goal of the plan being designated as either return to parent or adoption. Mother agreed to the plan other than its stated goal of adoption. This plan included more specific requirements related to the action steps outlined above, as well as additional action steps requiring Mother to maintain contact with DCS and submit to and

pass random drug screens, both urine and hair follicle, administered by DCS. Mother again agreed to this plan. A third parenting plan was created on June 13, 2017, and ratified on September 11, 2017. Mother's action steps under this plan were not materially altered. In the September 18, 2017 ratification order, the trial court expressly found that Mother had been provided with a copy of the Criteria and Procedures for Termination of Parental Rights and that Mother again agreed to the plan other than its goal of adoption.

Ms. Cano testified that Mother largely failed to complete the action steps required by the permanency plans. According to Ms. Cano, Mother failed to pay any child support while the children have been in foster care, despite a court order to do so. In addition, Ms. Cano testified that Mother has been unable to obtain steady employment, having been "let go" from her most recent job in November 2016. According to Ms. Cano, Mother also failed to establish a suitable home, as Mother moved frequently during the pendency of the case and refused to attend a residential drug treatment program. DCS offered various support to Mother in obtaining housing, such as offering to help Mother apply for public housing. According to Ms. Cano, the last home that Mother was believed to be staying at was unsuitable for the children due to known drug use in the home. As a result of Mother's frequent moves, she failed to maintain consistent contact with DCS or provide DCS with updated contact information.

Ms. Cano was particularly concerned with Mother's lack of effort to remedy her drug problem. Mother completed two alcohol and drug assessments in November 2016 and February 2017; Mother, however, did not follow the recommendations of the assessments to complete drug treatment. Ms. Cano testified that in order to remedy Mother's drug and alcohol issues, Mother would be required to complete "an entire" drug and alcohol program, including aftercare and attendance at AA/NA meetings. Mother had attempted three alcohol and drug programs without finishing any program through to completion including recommended aftercare. One program, Lovelady in Alabama, discharged Mother from the program when she admitted to smoking marijuana.[3] Ms. Cano also testified that Mother continued to associate with known drug users, as Ms. Cano retrieved Mother from the home of a known drug user. Mother tested positive for methamphetamines as late as November 27, 2017, over a year following the removal of the children and more than two months following the filing of the termination petition.

Ms. Cano also testified that Mother had not completed all requirements related to her mental health. Mother self-reported mental health concerns related to anxiety, post-traumatic stress disorder, depression, and a past diagnosis for schizophrenia. According to Ms. Cano, untreated, these conditions endanger the children's safety. Despite these facts, Mother has failed to maintain consistent mental health treatment, although Mother did complete a mental health assessment at some point. Mother was discharged from one treatment program in April 2016 because Mother failed to maintain contact. Although

---

[3] Mother admitted that she was discharged from this program, but testified that she never admitted to smoking marijuana during the program and that she later passed a drug screen.

- 3 -

Mother attended some additional appointments in 2016, Ms. Cano testified that Mother failed to attend any treatment at that location in 2017. Ms. Cano detailed another episode where DCS attempted to obtain out-of-town treatment for Mother's mental health issues at her request, going so far as to contact the treatment center regarding a place for Mother and offering transportation to the treatment location; when a place for Mother became available, however, Mother refused to attend the treatment. Ms. Cano further testified that Mother generally did not allow DCS to conduct random pill counts and often refused drug screenings.

Mother completed eight parenting classes and has maintained regular in-person visitation with the children, where she often brought snacks for the children; telephonic visitation was spotty due to issues of maintaining contact with Mother. According to Ms. Cano, Mother generally attempts to demonstrate appropriate parenting skills and shows love and affection with the children during the visits, but has difficulty parenting appropriately at times. Sometimes during visits, Mother appeared to be "tweaking." Mother incurred no additional criminal charges following removal of the children.

According to Ms. Cano, the children exhibited some mental health and behavioral problems upon first being removed in June 2016. One issue involves anxiety over food, which Ms. Cano testified was common with children who had been homeless or hungry prior to entering custody. Ms. Cano testified that the twins often exhibited issues following visits with Mother. In contrast, Karisah has exhibited some stress as to "when . . . mommy's going to be able to take me home." These issues, however, have improved over time. Ms. Cano testified that the children are strongly bonded to their foster family, referring to the foster parents as "mommy and daddy," while referring to Mother by her first name. Ms. Cano admitted that Karisah has a stronger bond with Mother than the twins have, as the twins have lived with the foster family a considerable portion of their lives.

Mother denied that she had no stable income or stable home. According to Mother, she had been babysitting for income the few weeks prior to trial earning approximately $25.00 per day.[4] When questioned as to why she did not work prior to this time, Mother would only respond that she was "dealing with some things." Mother also receives food stamps. Mother admitted, however, that she could not support the children on this income, but testified that if the children were returned, she would also be eligible to receive social security benefits. Mother admitted, however, that she had trouble providing support for the children when they had been in her custody even though she had been receiving the benefits.

Although Mother's overnight babysitting job took place at the home that Ms. Cano testified was unsuitable for the children due to drug use, Mother denied that she was

---

[4] Mother also testified that she had not babysat in the week immediately preceding trial and that on one day, she could not work because she "was trying to mentally heal myself."

living in this home. Instead, Mother testified that she was living in a three-bedroom home with her significant other and her significant other's mother. DCS never visited the home. In addition, Mother testified to her plan to return to a residential treatment program that could take up to one year to complete. Mother also testified that she is on a waiting list for government housing and claimed that she continues to participate in medication management for her mental health issues. Mother admitted, however, that she has used drugs in the past and that she has a drug problem, conceding that the longest she was able to maintain sobriety was four months.

The children's foster mother ("Foster Mother") was the final witness to testify. The children were placed with Foster Mother and her husband on August 16, 2016. Foster Mother echoed Ms. Cano's testimony concerning the issues experienced by the children upon first being placed in foster care. In particular, Foster Mother testified that Karisah would become extremely upset when Foster Mother closed doors in the house. All of the children would "throw fits," with Karisah spitting on people and the twins biting themselves. According to Foster Mother, while the children still have normal "temper tantrums," they no longer engage in their prior violent behavior. In addition, Foster Mother testified that the children have transitioned into her family's household and become used to having stable care; at the beginning of the placement, Foster Mother testified that the children appeared to be accustomed to taking care of themselves or being cared for by Karisah. Foster Mother also testified that the children become upset when Mother fails to take part in telephonic visitation; missed telephonic visitation is common because of the inability to keep in contact with Mother. Finally, Foster Mother testified that the children are well bonded to her family and that she and her husband wish to adopt the children.

At the conclusion of trial, DCS abandoned the ground of abandonment by willful failure to support. On February 23, 2018, the trial court entered an order terminating Mother's parental rights. Specifically, the trial court ruled that DCS submitted clear and convincing evidence of abandonment by failure to establish a suitable home, substantial noncompliance with a permanency plan, persistence of conditions, failure to manifest a willingness and ability to assume custody, and severe child abuse. The trial court also ruled that termination of Mother's parental rights was in the children's best interests. Mother thereafter appealed to this Court.

### Issues Presented

Mother raises a single issue in this appeal: whether the trial court erred in finding clear and convincing evidence that termination of Mother's parental rights is in the child's best interest. Pursuant to this Court's duty established in *In re Carrington H.*, 483 S.W.3d 507 (Tenn. 2016), we will also consider whether clear and convincing evidence establishes the grounds found by the trial court. *Id.* at 525–26 ("[W]e hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in

the child's best interests, regardless of whether the parent challenges these findings on appeal.").

## Standard of Review

The Tennessee Supreme Court has explained that:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547–48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578–79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as parens patriae has a special duty to protect minors. . . .' Tennessee law, thus, upholds the [S]tate's authority as parens patriae when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250.

*In re Carrington H.*, 483 S.W.3d 507, 522–23 (Tenn. 2016) (footnote omitted). In Tennessee, termination of parental rights is governed by statute which identifies "'situations in which that state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought.'" *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). Thus, a party seeking to terminate a parent's rights must prove (1) existence of one of the statutory grounds and (2) that termination is in the child's best interest. Tenn. Code Ann. § 36-1-113(c); *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases. *Santosky*, 455 U.S. at 769. As such, a party must prove statutory grounds and the child's best interest by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W. 3d at 546. Clear and convincing evidence "establishes that the truth of the facts asserted is highly probable . . . and eliminates any serious or substantial doubt about the correctness of the

conclusions drawn from evidence[,]" and "produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004).

In termination cases, appellate courts review a trial court's factual findings de novo and accord these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W at 523–24 (citing *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). Our supreme court further explains:

> The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.,* 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.,* 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d at 524.

Lastly, in the event that the "resolution of an issue in a case depends upon the truthfulness of witnesses, the trial judge, who has had the opportunity to observe the witnesses and their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." *In re Navada N.*, 498 S.W.3d 579, 591 (Tenn. Ct. App. 2016) (citing *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This Court therefore "gives great weight to the credibility accorded to a particular witness by the trial court." *In re Christopher J.*, No. W2016-02149-COA-R3-PT, 2017 WL 5992359, at *3 (Tenn. Ct. App. Dec. 4, 2017) (citing *Whitaker*, 957 S.W.2d at 837).

## Discussion

### Grounds for Termination

The trial court found five grounds to terminate Mother's parental rights: (1) abandonment by failure to establish a suitable home; (2) substantial noncompliance with a permanency plan; (3) persistence of conditions; (4) failure to manifest a willingness and ability to assume custody; (5) and severe child abuse. We will consider each ground in turn.

### I.

Abandonment is a statutory ground for termination of parental rights. Tenn. Code Ann. § 36-1-113(g)(1). For purposes of this appeal, Tennessee Code Annotated section 36-1-102 defines "abandonment," in relevant part, as

> The child has been removed from the home of the parent or parents or the guardian or guardians as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

Tenn. Code Ann. 36-1-102(a)(ii) (2017).[5]

---

[5] In 2018 following the initiation of this case, section 36-1-102(a) was amended. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. The definition now reads, in relevant part, that abandonment may be defined as

> (ii)(a) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;
> (b) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and
> (c) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it

Here, there is no dispute that the children were removed from Mother's home and adjudicated dependent and neglected by the juvenile court. The trial court specifically found that DCS had exerted reasonable efforts to help Mother, which Mother does not dispute on appeal. In spite of these efforts, the evidence shows that Mother made no similar effort, refusing offered support from DCS, particularly those services that were aimed at remedying Mother's drug use. "[A] 'suitable home' means more than just adequate physical space." *In re Saliace P.*, No. W2015-01191-COA-R3-PT, 2016 WL 304543, at *6 (Tenn. Ct. App. Jan. 26, 2016) (citations omitted). A suitable home also requires that the home be free from drugs and domestic violence. *In re Jakob O.*, No. M2016-00391-COA-R3-PT, 2016 WL 7243674, at *9 (Tenn. Ct. App. Sept. 20, 2016) (citing *In re Hannah H.*, No. E2013-01211-COA-R3-PT, 2014 WL 2587397, at *9 (Tenn. Ct. App. June 10, 2014)). In this case, Mother's persistent failure to make an effort to address her drug and mental health issues renders her home unsafe. Indeed, Mother admitted at trial that she has a drug problem and that although she refused to participate in treatment previously, she has now come to the conclusion that treatment is appropriate. As such, the trial court did not err in finding clear and convincing evidence to support this ground for termination.

## II.

Another ground for termination may be found when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan[.]" Tenn. Code Ann. § 36-1-113(g)(2). Termination of parental rights under section 36-1-113(g)(2) "requires more proof than that a parent has not complied with every jot and tittle of the permanency plan." *In re M.J.B.*, 140 S.W.3d 643, 656 (Tenn. Ct. App. 2004). To succeed under section 36-1-113(g)(2), DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *Id.* at 656–57 (citing *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002); *In re L.J.C.*, 124 S.W.3d 609, 621 (Tenn. Ct. App. 2003)). Second, DCS must show that "the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met." *Id.* at 657 (citing *In re Valentine*, 79 S.W.3d at 548–49; *In re Z.J.S.*, No. M2002-02235-COA-R3-JV, 2003 WL 21266854, at * 12 (Tenn. Ct. App. June 3, 2003)).

---

appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department; . . . .

Tenn. Code Ann. § 36-1-102(a)(ii) (2018). No party has argued that the recently amended version of this statute is applicable in this case. As such, we apply section 36-1-102(a)(ii) at existed at the initiation of this case.

As previously discussed the three permanency plans entered in this case generally required that Mother: (1) participate in a mental health assessment, including requiring Mother to apply for TennCare insurance if needed, follow all recommendations of the assessment, and sign all necessary releases so that DCS can obtain records; (2) allow DCS to conduct random pill counts if any medications are prescribed to her and take all medications as prescribed; (3) complete parenting class, provide proof of completion to DCS, and demonstrate effective parenting skills with the children; (4) complete an alcohol and drug assessment, actively participate in any recommended treatment, complete all recommended aftercare including alcoholic anonymous or narcotics anonymous classes; (5) refrain from associating with known drug users; (6) secure a legal means of income; (7) secure safe and stable housing with working utilities and a supply of food; (8) resolve all legal issues and follow any and all rules of her probation; (9) maintain contact with DCS; and (10) submit to and pass random drug screenings. In this case, the children were removed from Mother's custody due to issues of drug use, mental health issues, criminal charges, and environmental concerns. Like the trial court, we conclude that these requirements were reasonable and related to the conditions that necessitated removal.

The evidence shows, however, that Mother substantially failed to comply with these requirements. The two majors concerns that led to the removal of the children were Mother's untreated mental health issues and her drug use. Mother made little effort to complete many of the requirements related to these issues. Although Mother did participate in two drug and alcohol assessments provided by DCS, Mother generally failed to follow the recommendations. By the time of trial, Mother had failed to complete a single drug treatment program recommended by her assessments. Mother also never provided DCS proof that she was participating in AA/NA classes, failed to comply with pill counts and random drug screenings, and failed to maintain sufficient contact with DCS so that her progress on these steps could be monitored. When Mother did take drug screens, she tested positive for illegal drugs as late as November 2017. On the whole, we conclude that DCS presented clear and convincing evidence that Mother's noncompliance with the permanency plans was substantial. This ground is therefore affirmed.

### III.

A third ground for termination occurs when

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

- 10 -

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home; . . . .

Tenn. Code Ann. § 36-1-113(g)(3) (2017).[6]

The children were removed from Mother's home on June 8, 2016. An order was entered declaring the children dependent and neglected on December 9, 2016. The termination petition was filed approximately fourteen months following the removal and more than six months from the entry of the adjudicatory order, on August 15, 2017. As such, this ground is clearly applicable.

Moreover, the evidence presented clearly establishes that the conditions that led to the children's removal persist. DCS presented evidence to show that Mother has done little to combat her drug issues, despite the fact that Mother admitted to having a drug problem. Likewise, Mother has done little to remedy her admitted mental health issues. Mother's failure to address these issues in the fourteen months following the removal of the children, the second removal that Mother has experienced, gives this Court little confidence that she will be likely to remedy these issues in the future in order to maintain a safe home for her children. Finally, continuing the relationship with Mother would prevent the children's chances of early integration into a safe, stable, and permanent home. The trial court's determination with regard to this ground is therefore affirmed.

---

[6] This ground for termination was also amended in 2018. *See* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. The current version of the statute provides a ground for termination where

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:
(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;
(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and
(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home.
(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard.

Again, neither party argues that this Court should apply the current version of the statute; as such, we apply the version in effect at the time the termination petition was filed.

- 11 -

## IV.

The trial court also found that Mother failed to manifest an ability and willingness to assume custody of the children pursuant to Tennessee Code Annotated section 36-1-113(g)(14). This ground may be found when

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

Tenn. Code Ann. § 36-1-113(g)(14). We have previously held that evidence was sufficient to meet this ground when it showed that the parent voluntarily chose to live a lifestyle that lacked stability. *See **In re Morgan K.***, No. M2018-00040-COA-R3-PT, 2018 WL 5733291, at *13 (Tenn. Ct. App. Oct. 31, 2018).

In this case, the trial court found that DCS had proved this ground by showing that Mother has no place to live or legal means to support herself or her children. The trial court also noted that Mother is "battling a drug problem" by allegedly planning to enroll in a drug program that may take a year to complete. We agree that clear and convincing evidence supports this ground. Mother has had fourteen months to remedy her drug problem and the issues with her living situation. Ms. Cano testified that Mother has generally lived a transient lifestyle, although Mother testified at trial that she now has an appropriate home. Despite having time to obtain stable employment, by the time of trial, Mother was almost totally reliant on others for her support and home. Mother therefore has no current ability to assume custody of the children and her refusal to participate in many of the services offered by DCS reflects that she has been largely unwilling to perform the work that would be required to secure their return. Considering her current situation, the children would be at risk of substantial harm if returned to Mother's custody. As such, this ground for termination is affirmed.

## V.

The final ground for termination found by the trial court is severe child abuse. Tenn. Code Ann. § 36-1-113(g)(4) (2017) (providing a ground for termination where "[t]he parent or guardian has been found to have committed severe child abuse as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against the child who is the subject of the petition or against any sibling or half-sibling of such child, or any other child residing temporarily or permanently in the home of such parent or guardian[.]").[7] Severe child abuse is defined, in relevant part as

---

[7] The current version of the statute provides that this ground may be found when

(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death;

(ii) "Serious bodily injury" shall have the same meaning given in § 39-15-402(d).

Tenn. Code Ann. § 37-1-102(b)(22)(A).

The trial court found that Mother committed severe child abuse when she knowingly allowed two of the children to be exposed to drugs. The record supports the trial court's conclusion on this ground. This Court has previously held that exposure to illegal drugs may constitute severe abuse. *See, e.g.,* ***In re A.L.H.***, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at \*5 (Tenn. Ct. App. Aug. 31, 2017) ("This Court has repeatedly held that exposure of a child to drugs constitutes severe child abuse."). On November 28, 2016, the juvenile court ruled that two of the children had tested positive for methamphetamine during a hair follicle drug screen administered by DCS.[8] Mother did not appeal the juvenile court's severe abuse finding and it has now undisputedly become final.[9] As such, the severe abuse finding is res judicata in this appeal. *See generally* ***In re Dakota C.R.***, 404 S.W.3d 484, 497–98 (Tenn. Ct. App. 2012) (discussing the res judicata effect of a severe abuse finding). The trial court therefore did not err in terminating Mother's parental rights to all the children on this ground. *See* Tenn. Code Ann. § 36-1-113(g)(4) (stating the ground of severe abuse may be found where either the child, the child's sibling  or half-sibling, or a child residing in the home was the victim of severe abuse).

## Best Interest

Having determined that at least one ground for termination is supported by clear and convincing evidence, we proceed to consider whether clear and convincing evidence supports the trial court's determination that termination of Mother's parental rights is in the child's best interests. "Upon establishment of a ground for termination, the interests of the child and parent diverge, and the court's focus shifts to consider the child's best

---

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child; . . . .

Tenn. Code Ann. § 36-1-113(g)(4) (2018); *see also* 2018 Tenn. Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018 (enacting this amendment). Again, we apply the version of the statute applicable at the time the petition was filed.

[8] These drug screens occurred shortly after the removal of the children, on June 23, 2016.

[9] The termination petition was filed as a separate action from the dependency and neglect case.

interest." ***In re Audrey S.***, 182 S.W.3d 838, 877 (Tenn. Ct. App. 2005). Even where a parent is unfit, termination may not necessarily be in the best interests of the child. ***Id.***

Tennessee's termination statute lists the following factors to be used in the best interest analysis:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i).

The Tennessee Supreme Court has explained that:

Facts considered in the best interests analysis must be proven by a preponderance of the evidence, not by clear and convincing evidence. After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests. When considering these statutory factors, courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective. Indeed, a focus on the perspective of the child is the common theme evident in all of the statutory factors. When the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child.

*In re Gabriella D.*, 531 S.W.3d 662, 681−82 (Tenn. 2017) (internal citations omitted). Furthermore, "[a]scertaining a child's best interests does not call for a rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. The analysis requires "more than tallying the number of statutory factors weighing in favor of or against termination." *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193−94 (Tenn. Ct. App. 2004)). "The facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "[d]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *Id.* (citing *In re Audrey S.*, 182 S.W.3d at 878). In undertaking this analysis, the court must examine all of the statutory factors, as well as other relevant proof put forth by the parties. *Id.*

In the present case, the trial court found that termination of Mother's parental rights was in the children's best interests. From the record, we agree. Like the trial court, we conclude that Mother has not made an adjustment of circumstances sufficient to allow return of the children, despite reasonable efforts by DCS. *See* Tenn. Code Ann. § 36-1-113(i)(1), (2). Further, Mother has an ongoing drug problem evidenced by a positive drug screen as late as November 2017 for which she is still planning to receive treatment. Indeed, Mother admitted that she has been able to maintain sobriety for no more than a single four month period. Although Mother has maintained regular visitation with the children, *see* Tenn. Code Ann. § 36-1-113(i)(3), it appears that the children do not have a particularly meaningful relationship with Mother. *See* Tenn. Code Ann. § 36-1-113(i)(4). Rather, the children are strongly bonded with their foster parents; the children refer to foster parents as "mommy and daddy," while the children refer to Mother by her first

name. As such, a change in caretakers would likely have a detrimental effect on the children. *See* Tenn. Code Ann. § 36-1-113(i)(5). Moreover, Mother was found to have committed severe child abuse by exposing two of the children to drugs. *See* Tenn. Code Ann. § 36-1-113(i)(6). Although Mother testified that she is living in an appropriate home for the children, it appears that Mother's continued drug use renders this home unsafe. *See* Tenn. Code Ann. § 36-1-113(i)(7). Indeed, Mother has tested positive for drugs throughout the pendency of this matter, often refused drug screens provided by DCS, and has generally refused to follow recommendations related to her mental health. *See* Tenn. Code Ann. § 36-1-113(i)(8). Finally, Mother has not paid child support in the time that the children have been in foster care, although she does take food to her scheduled visits. *See* Tenn. Code Ann. § 36-1-113(i)(9). In sum, the children are bonded both to foster parents and to each other. The evidence shows that they need stability, which foster parents are able to provide. Mother, in contrast, is simply not able to provide the stability necessary for the care of these children. As such, clear and convincing evidence establishes that termination of Mother's parental rights is in the children's best interest.

## Conclusion

The judgment of the Juvenile Court of Warren County is affirmed and this cause is remanded to the trial court for all further proceedings as are necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellant Amanda D.N.S., for which execution may issue if necessary.

 

 

_____
J. STEVEN STAFFORD, JUDGE